UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHINA NATIONAL CHARTERING CORP.
n/k/a CHINA NATIONAL CHARTERING CO., LTD.,

                Plaintiff,


       -against-                           06 Civ. 13107 (LAK)


PACTRANS AIR & SEA, INC.,

                Defendant,
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
PACTRANS AIR & SEA, INC.,

                Third-Party Plaintiff,


       -against-


DEVON INTERNATIONAL TRADING INC.,
DEVON SAFETY PRODUCTS INC., and
DEVON INTERNATIONAL INC.,

                Third-Party Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OPINION

       Appearances:

Patrick F. Lennon
Nancy R. Siegel
LENNON, MURPHY, CAULFIELD & PHILLIPS, LLP
*Attorneys for Plaintiff*

James M. Maloney
*Attorney for Non-Party PAC Logistics
  Service Co., Inc.*

Bill Xian Feng Zou
*Attorney for Defendant–
  Third-Party Plaintiff Pactrans Air &
  Sea, Inc.*

LEWIS A. KAPLAN, *District Judge.*

On February 10, 2011, the Court of Appeals remanded this case to this Court for a determination whether there was personal jurisdiction over defendant Pactrans Air & Sea, Inc. ("Pactrans") sufficient to support an arbitration award obtained against it by China National Chartering Corp. ("CNCC").[1] Following jurisdictional discovery and additional briefing, the Court now concludes that it lacks personal jurisdiction over Pactrans.

*Facts*

This action has followed a long and circuitous path.

*The Original Transaction*

In 2006, Devon International Trading ("Devon") retained Pactrans as a freight forwarder to ship a cargo of gypsum wallboard from China to Pensacola, Florida.[2]  Acting as Devon's agent, Pactrans in turn chartered the M/V SANKO RALLY from CNCC to carry the cargo.[3] Under the terms of the charter party, Devon was obliged to make all payments for charter hire and other costs and expenses relating to the shipment, including demurrage, while Pactrans was responsible for loading, stowing, and securing the cargo on board the vessel.[4]

---

[1]  See *China Nat'l Chartering Corp. v. Pactrans Air & Sea, Inc.*, 411 F. App'x 370, 372 (2d Cir. 2011) (summary order).

[2]  DI 48, at 2.

[3]  *Id.*

[4]  *Id.*

The cargo was loaded in Qingdao, China, in April 2006.[5]  Upon arrival in Pensacola in June 2006, "an inspection determined that much of the cargo had been damaged and/or destroyed during transport."[6]  The unloading of the cargo and the departure of the vessel were delayed several days as the parties sought to identify, sort, and release the sound portion of the cargo.[7]

*Florida Litigation*

Much litigation ensued.  Shortly after the vessel's arrival in Pensacola, Devon sued the M/V Sanko Rally, *in rem*, and Pactrans, *in personam*, in the Northern District of Florida for damage to the cargo.[8]  Pactrans counterclaimed for indemnity and contribution in the event it were found liable.[9]  It filed also a separate action against CNCC and Devon seeking, *inter alia*, the same relief as that requested by its counterclaim.[10]

*New York Litigation*

Finally, in November 2006, CNCC filed this action and sought process of maritime

---

[5]     *Id.*

[6]     *Id.*

[7]     *Id.*

[8]     *See* Compl. ¶¶ 6–8, *Devon Int'l Trading Inc. v. M/V Sanko Rally*,  No. 06 Civ. 285 (N.D. Fla. filed June 29, 2006) (DI 1).

[9]     *See* Answer, at 12–15, *Devon Int'l Trading Inc. v. M/V Sanko Rally*, No.06 Civ. 285 (N.D. Fla. filed Nov. 6, 2006) (DI 22).

[10]     *See* Compl., at 11–13, *Pactrans Air & Sea Inc. v. China Nat'l Chartering Corp.*, No. 06 Civ. 369 (N.D. Fla. filed Aug. 29, 2006) (DI 1).

4

attachment ("PMAG") pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil Procedure.[11]  The complaint alleged that in April 2006, the parties had entered into a charter for the carriage of certain cargoes, but that "during the course of the charter party contract" disputes had arisen regarding the defendant Pactrans's "failure to pay demurrage due and owing" to CNCC under the charter party.[12]  CNCC sought recovery in excess of $775,000—losses due to the alleged breach totaling $543,814.74, interest in the amount of $106,486.14, and estimated attorneys' fees and arbitration costs of $125,000.[13]  At the time the complaint was filed, the dispute was to be submitted to arbitration pursuant to the parties' contract.[14]

On November 13, 2006, this Court issued an order pursuant to Rule B of the Admiralty Rules directing that PMAG issue against all tangible and intangible property of Pactrans in an amount up to and including $775,300.88.[15]  After Pactrans filed an answer[16] and a verified third-party complaint[17] against Devon, the Court issued another order, on December 21, 2006, directing the issuance of PMAG against Devon in an amount up to and including $775,300.88.[18]

---

[11]     *See* DI 1.

[12]     *Id.*, ¶ 6–7.

[13]     DI 1, ¶¶ 8, 12.

[14]     *Id.*, ¶9; *see* DI 48, at 3; *see* DI 72, ¶¶ 10–12.

[15]     *See* DI 3.

[16]     DI 7.

[17]     DI 8.

[18]     *See* DI 10.  Pactrans amended its third-party complaint in April 2007.  *See* DI 15.

The case was referred to a magistrate judge, who issued a Report and Recommendation in October 2008 on Devon's motion to vacate the Rule B attachments.[19]   The Court adopted the magistrate's Report and Recommendation in a December 16, 2008 order, granting Devon's motion to vacate the PMAG on the basis that Devon had established "that it [is] subject to *in personam* jurisdiction in another jurisdiction convenient to Pactrans," referring to the Florida lawsuit.[20]   As a practical matter, Devon's participation in this matter in this Court then came to a close, although it remained—and still remains—a party.

*The Arbitration*

In the meantime, CNCC pursued arbitration in China, which resulted in March 2009 in an award in its favor and against Pactrans in the amount of $770,237.08 plus attorneys' fees and costs in the amount of $6,832.53.[21]   In July 2009, CNCC petitioned this Court to confirm the award. The motion was fully submitted on September 15, 2009.[22]

One month later, the Second Circuit decided *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*,[23] which overruled *Winter Storm Shipping, Ltd. v. TPI*,[24] which in turn had held

---

[19]
  *See* DI 45 (Report and Recommendation); DI 31 (Devon's motion to vacate).

[20]
  DI 48, at 7 (alteration in original) (internal quotation marks omitted).

[21]
  DI 72, ¶ 27; *see* DI 71, at 1.

[22]
  *See* DI 73; DI 77; DI 82.

[23]
  585 F.3d 58 (2d Cir. 2009), *cert. denied*, — U.S. —, 130 S. Ct. 1896 (2010).

[24]
  310 F.3d 263 (2d Cir. 2002), *cert. denied*, 539 U.S. 927 (2003).

that electronic fund transfers, or "EFTs," processed at intermediary banks in New York were attachable property under Supplemental Rule B.[25]  Under *Jaldhi*, however, such EFTs no longer could be attached under the maritime rules.[26]

---

[25]

       *Id.* at 278.

[26]

       A brief history of the development of the law in this area is in order here.

       Rule B of the Admiralty Rules provides for the attachment pursuant to federal process of "the defendant's tangible or intangible personal property." FED. R. CIV. P. SUPP. R. B(1)(a). This centuries-old practice "is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 437 (2d Cir. 2006), *abrogated on other grounds by Jaldhi*, 585 F.3d 58.  The purposes of the attachment power historically have been to gain jurisdiction over absent defendants and to ensure satisfaction of judgments. *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950).  To begin the attachment process, "a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district." *Aqua Stoli*, 460 F.3d at 438; *see* FED. R. CIV. P. SUPP. R. B(1)(a)–(b).  If the plaintiff satisfies those requirements, the court must enter an order of attachment to be served on any persons in possession of the defendant's property within the district. FED. R. CIV. P. SUPP. R. B(1)(b).  The property to be attached need not have any connection to claim sued upon.  *See* FED. R. CIV. P. SUPP. R. B(1)(a).  The plaintiff must provide notice to the defendant before a default judgment may be entered.  FED. R. CIV. P. SUPP. R. B(2).  Finally, once the court attaches the property, the defendant may appear in the district court to contest the attachment and force the plaintiff "to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." FED. R. CIV. P. SUPP. R. E(4)(f).

       In *Winter Storm*, the Second Circuit confronted for the first time whether EFTs constituted property of a defendant subject to maritime attachment under the Admiralty Rules.  310 F.3d at 274.  In that case, the plaintiff alleged breach of contract and simultaneously sought an order of attachment against the defendant's assets.  *Id.* at 265–66.  The district court granted an *ex parte* order of attachment, and the plaintiff served process of maritime attachment on the Bank of New York ("BONY"), as a potential garnishee, six days later. *Id.* at 266.  As a result of the attachment order, BONY placed a stop order on funds related to the defendant that passed through BONY.  *Id.*  Pursuant to an entirely unrelated contract, the defendant directed funds to be paid in dollars from a Thai bank to a Scottish bank, requiring clearing through BONY.  *Id.*  BONY then withheld the amount attached by the court's order from the EFT and placed it in a suspense account, and the plaintiff served BONY with a subsequent attachment order the next day.  *Id.*  The district court, on a Rule E(4) application from the defendant, vacated the attachment order, determining that the EFT funds passing through intermediary bank BONY were not "property" for the purposes of maritime attachment.  *Id.*  The district court concluded that no federal law was on point, and

that New York law forbade courts from attaching funds in an intermediary bank. *Id.* at 267. The Second Circuit reversed, looking to the broad language of Rule B and past cases involving the seizure of drug-money transfers to hold that "EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a)." *Id.* at 278.

That holding, though, led to "unforeseen consequences," including a bevy of attachment orders served daily on New York banks and a sharp rise in maritime attachment cases, which eventually constituted one third of the docket of the S.D.N.Y. *Jaldhi*, 585 F.3d at 62. It "introduced uncertainty into the international funds transfer process" and "undermined the efficiency of New York's international funds transfer business." *Id.* (internal quotation marks omitted).  Observing "a trend toward limiting maritime attachments of EFTs in our Circuit," the Second Circuit sought in *Jaldhi* to "definitively untangle the doctrinal knot created by Winter Storm and its progeny."  *Id.* at 64.

The litigation in *Jaldhi* sprung from a deadly crane accident on board a vessel transporting iron ore from India to China.  *Id.*  The accident rendered the vessel inoperable for several months as safety inspections were conducted and repairs were made.  *Id.* at 64–65.  Several weeks after the vessel came back "on hire," the plaintiff issued an invoice to the defendant for an unpaid balance under the parties' contract.  *Id.* at 65.  Pursuant to Rule B, the district court entered an *ex parte* order of attachment, and the plaintiff subsequently attached EFTs totaling nearly $5 million.  *Id.*  The majority of the EFTs had the defendant as the beneficiary, rather than the originator, of the transfers.  *Id.*  On a Rule E(4) motion, the district court vacated the attachment order as applied to EFTs in which the defendant was the beneficiary.  *Id.*

The Second Circuit upheld the order vacating the attachment, overruled *Winter Storm*, and held that "EFTs are not the property of either the originator or the beneficiary" and thus cannot be the defendant's property subject to attachment under Rule B.  *Id.* at 71.  Finding *Winter Storm*'s "reasons unpersuasive and its consequences untenable," the court distinguished the principal drug-money-forfeiture case relied upon in *Winter Storm* as requiring only funds traceable to illegal activity and not ownership in any sense.  *Id.* at 69. The court concluded that the practices that evolved in the wake of *Winter Storm* were divorced from the traditional purposes of maritime attachment, including that "maritime plaintiffs now seek writs of attachment pursuant to Rule B long before the defendant's property enters the relevant district, often based solely on the speculative hope or expectation that the defendant will engage in a dollar-denominated transaction that involves an EFT during the period the attachment order is in effect."  *Id.* at 70.  The court then looked to state law, and likewise found that, definitively, EFTs in the possession of an intermediary bank could not be considered to be defendant's property under New York law. *Id.* at 70–71.  Therefore, "because there is no governing federal law on the issue and New York law clearly prohibits attachment of EFTs," the court "conclude[d] that EFTs being processed by an intermediary bank in New York are not subject to Rule B attachment."  *Id.* at 71.

Several months later, the Second Circuit held that "the rule announced in [*Jaldhi*] has retroactive effect to all cases open on direct review."  *Hawknet, Ltd. v. Overseas Shipping*

The property attached by CNCC at the outset of this action was EFTs.[27]   Not surprisingly, just three days after *Jaldhi* was published, Pactrans moved to vacate the attachment on the basis that the pre-*Jaldhi* law in this Circuit no longer controlled.[28]   Days later, the Court issued an order to show cause "why the process of maritime attachment previously issued should not be vacated or modified and the action dismissed in light of" *Jaldhi*.[29]

The ensuing month was a busy one.   On November 13, 2009, the Court granted CNCC's motion to confirm the Chinese arbitration award.[30]   Judgment was entered on November 16.[31]   Days later, on November 19, Pactrans moved this Court for reconsideration, vacatur of the order confirming the arbitration award, and dismissal of the action, arguing that the Court lacked

---

*Agencies*, 590 F.3d 87, 91 (2009).

[27]

*See* DI 1, ¶ 13 ("The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including" various New York banks "which are believed due and owing to the Defendant.").

[28]

*See* DI 86, at 1 ("The Ex Parte Order for Process of Maritime Attachment against Pactrans, who cannot be found in this District, was entered for the sole reason that Pactrans might have electronic fund transfers through this District.   All funds attached against Pactrans based on such ex parte order were all in fact electronic fund transfers.   Since such funds are no longer subject to attachment under Rule B, it is respectfully submitted the Ex Parte Order for Process of Maritime Attachment should be vacated, all funds attached should be released forthwith to Pactrans.").

[29]

DI 87, at 1.

[30]

*See* DI 89, at 5.   The Court denied CNCC's request for attorneys' fees.   *See id.*

[31]

*See* DI 90.

9

jurisdiction over Pactrans in light of *Jaldhi*.[32]  On November 23, the Court—acting on its order to

show cause[33]—vacated the attachment in light of *Jaldhi* and the Second Circuit's subsequent holding

in *Hawknet, Ltd. v. Overseas Shipping Agencies*[34] that *Jaldhi* was retroactive.[35]

    At that point, Pactrans' motion for reconsideration and vacatur of the confirmation

of the arbitral award remained pending in this Court.  Pactrans nevertheless appealed the order

confirming the Chinese arbitration award and sought a stay, making the same substantive arguments

to the Circuit that it had made to this Court in moving to reconsider.[36]  A single judge of the Second

Circuit stayed the confirmation order pending a motion panel's consideration of Pactrans's request

for a stay of that ruling pending appeal.[37]  With both a motion for reconsideration of the Court's

confirmation order pending before this Court and an appeal from the same order pending before the

Second Circuit, a judge of the Second Circuit held a telephonic conference on December 3.[38]  As

---

[32]

> *See* DI 91, at 1; DI 156, at 3 (Because it "believed the order confirming the foreign arbitration award" was "premature, seeing there were motions submitted on the ability of the Court to hear the action after *Jaldhi*, Pactrans accordingly moved to reargue Plaintiff's motion to recognize, confirm and enforce the foreign arbitration.").

[33]

> DI 87.

[34]

> 590 F.3d 87 (2009).

[35]

> *Id.* at 91.

[36]

> *See* DI 101.

[37]

> *See* DI 103.

[38]

> *See* DI 159 Exh. D (transcript of telephone conference).  For further discussion of the telephone conference, *see infra* text accompanying notes 113 and 114.

a result of the conference, Pactrans withdrew its motion for reconsideration on December 7.[39]

The activity did not stop there, however.  On December 10, CNCC requested this Court to rule as to its personal jurisdiction over Pactrans based on the various filings going to that question.[40]  The Court responded with a two-page order "declin[ing] the invitation to act in this context."  It explained that, while the Court had vacated the PMAG in accordance with *Jaldhi* and *Hawknet*, it had "declined to pass on the question of personal jurisdiction" more broadly because Pactrans had not yet had the opportunity to brief the question whatever "reasons independent of the Rule B attachment" might afford the Court personal jurisdiction over it.[41]  The Court thus "decline[d] plaintiff's request that [it] decide the issue in a vacuum."[42]

Finally, on January 19, 2011, the Second Circuit issued a summary order on Pactrans's appeal.[43]  It concluded that "[i]n light of . . . *Jaldhi* and *Hawknet*, . . . the district court's maritime attachment could not have provided personal jursidiction over Pactrans."[44]  It specifically declined to rule on whether the confirmation order could stand on another jurisdictional basis, including waiver of any objection to personal jurisdiction, although the panel stated in *dicta* that it considered it "unlikely" that CNCC could establish personal jurisdiction absent the Rule B

---

[39]     *See* DI 104.

[40]     *See* DI 105.

[41]     DI 106, at 2.

[42]     *Id.*

[43]     *See China Nat'l*, 411 F. App'x 370.

[44]     *Id.* at 372.

attachment.[45]  It said also that "CNCC should have an opportunity, in the changed legal landscape, to assert that the district court has a basis for personal jurisdiction over Pactrans."[46]  It therefore remanded the case to this Court for "determin[ation of] whether it [had] decided the personal jurisdiction issue before it entered judgment, and if not, [for] ent[ry of] an order to show cause why it should not dismiss the complaint for lack of jurisdiction."[47]  The Circuit further called this Court's refusal to decide the personal jurisdiction issue during the pendency of the Second Circuit appeal "appropriate, especially as [this Court] may have lacked jurisdiction over the case at that time, given that there were no pending post-judgment motions and a timely notice of appeal had been filed, divesting the district court of jurisdiction."[48]

Upon remand, the Court permitted CNCC to take jurisdictional discovery in aid of the Court's resolution of the Circuit's instructions, and permitted further briefing.[49]

## Discussion

### I.   Waiver or Forfeiture

"Personal jurisdiction, unlike subject-matter jurisdiction, can . . . be purposely waived

---

[45]

   *Id.* at 373 (internal quotation marks omitted).

[46]

   *Id.*

[47]

   *Id.*

[48]

   *Id.* at 3 n*.

[49]

   *See* DI 113, at 1; *see also* DI 134; DI 153; DI 156; DI 159.

or inadvertently forfeited."[50]  In determining whether such waiver or forfeiture of a defendant's personal jurisdiction objection has occurred, a court must "consider all of the relevant circumstances."[51]  Most crucially, the Federal Rules dictate that "a party forfeits its defense of lack of personal jurisdiction by failing timely to raise the defense in its initial responsive pleading."[52]  Moreover, "a variety of legal arrangements"[53] "may . . . estop[ a defendant] from raising the issue,"[54] as where "the actions of the defendant during the litigation amount to a legal submission to the jurisdiction of the court, whether voluntary or not.

  Here, the CNCC's waiver argument involves different aspects of Pactrans's conduct

---

[50]   *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011); *accord Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."); *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960).

  Though the two terms are often used interchangeably, "[t]he term 'waiver' is best reserved for a litigant's intentional relinquishment of a known right," but "[w]here a litigant's action or inaction is deemed to incur the consequence of loss of a right, or, as here, a defense, the term 'forfeiture' is more appropriate." *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999), *cert. denied*, 530 U.S. 1244 (2000).

[51]   *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 307 (2d Cir. 2002) (internal quotation marks omitted).

[52]   *Mickalis Pawn*, 645 F.3d at 134 (citing Fed. R. Civ. P. 12(h)); *accord JP Morgan Chase Bank, N.A. v. Law Office of Robert Jay Gumenick, P.C.* ("*Gumenick*"), No. 08 Civ. 2154, 2011 WL 1796298, at *2 (S.D.N.Y. Apr. 22, 2011); *see* 2 Daniel R. Coquillette et al., Moore's Federal Practice § 12.31[3] (3d ed. 2011) ("A defendant must object to the court's exercise of personal jurisdiction in the first Rule 12 motion or in the responsive pleading or be deemed to have waived the issue . . . .").

[53]   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (quoting *Ins. Corp. of Ir.*, 456 U.S. at 703).

[54]   *Ins. Corp. of Ir.*, 456 U.S. at 704.

13

in this litigation that, CNCC contends, individually or collectively waived or forfeited Pactrans's objections to personal jurisdiction.

### A.    Pactrans's Filing of Third-Party Complaint Against Devon

CNCC first argues that Pactrans's filing of its third-party complaint against Devon in this action "establish[ed] New York as the forum for its own separate litigation" and that Pactrans's request for "affirmative relief within this action . . . waiv[ed] any personal jurisdiction defense to this action."[55]   It suggests that Pactrans should have made a special, or "restricted," appearance to contest jurisdiction pursuant to Admiralty Rule E(8) in order to have preserved its objection to personal jurisdiction.[56]   Pactrans responds that it has "continuously maintained its position" vis-á-vis personal jurisdiction "since the inception of the case" and that a finding of waiver or forfeiture would be improper here.[57]

The Second Circuit has remarked that federal law on the issue of "whether the assertion of a counterclaim[58] in the answer [to a complaint] subjects [the defendant] to in personam

---

[55]    DI 134, at 3–4.

[56]    See id., at 16.

[57]    DI 156, at 2.

[58]    Although nearly all of the case law on this issue discusses the filing of counterclaims, rather than—as here—a third-party complaint, "[t]he reasoning advanced is equally appropriate in either situation."  *Bayou Steel Corp. v. M/V Amstelvoorn*, 809 F.2d 1147, 1149 n.4 (5th Cir.), *reh'g en banc denied*, 815 F.2d 700 (1987); *accord Toshiba Int'l Corp. v. Fritz*, 993 F. Supp. 571, 573 (S.D. Tex. 1998).

jurisdiction" is in "disarray"[59] and, to date, has not decided the question.[60]  As a court in this District has noted, it is an issue with "a rich and conflicted past."[61]

Before the adoption of the Federal Rules of Civil Procedure, "a defendant who combined a counterclaim with an objection to service of process waived the jurisdictional objection"[62] because it "affirmatively sought the aid of the court."[63]  Under that view, a defendant had to challenge jurisdiction through a "special appearance" in order to object to personal jurisdiction while preserving the right to file a counterclaim.[64]  If the jurisdictional objection failed, the defendant could file the counterclaim as part of its "general appearance;" if the objection

---

[59]

    *Cargill, Inc. v. Sabine Trading & Shipping Co.*, 756 F.2d 224, 229 (2d Cir. 1985); *accord SEC v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007) ("The rules governing consent [to, and waiver of objections to, personal jurisdiction] are not as immutable as they may appear.").

[60]

    *See Wafios Mach. Corp. v. Nucoil Indus., Ltd.*, No. 03 Civ. 9865, 2004 WL 1627168, at *1 (S.D.N.Y. July 21, 2004).

[61]

    *In re Arbitration Between InterCarbon Berm., Ltd. & Caltex Trading & Transp. Corp.*, 146 F.R.D. 64, 68 (S.D.N.Y. 1993).

[62]

    *Id.* (citing *Merchs. Heat & Light Co. v. J.B. Clow & Sons*, 204 U.S. 286, 289 (1907)); *see Adam v. Saenger*, 303 U.S. 59, 67–68 (1938); *Merchs. Heat & Light Co.*, 204 U.S. at 289 ("[B]y setting up its counterclaim the defendant became a plaintiff in its turn, invoked the jurisdiction of the court in the same action, and, by invoking, submitted to it."); *Bayou Steel Corp.*, 809 F.2d at 1148.

[63]

    *Wafios*, 2004 WL 1627168, at *1 (citing *Beaunit Mills, Inc. v. Industrias Renidas F. Matarazzo*, 23 F.R.D. 654, 656–57 (S.D.N.Y. 1959)).

[64]

    *InterCarbon Berm.*, 146 F.R.D. at 68; *see Davis v. Cleveland, Cincinnati, Chi., & St. Louis Ry. Co.*, 217 U.S. 157, 174 (1910) ("A court, without personal service, can acquire no jurisdiction over the person, and when it attempts to assert jurisdiction over property, it should be open to the defendant to specially appear to contest its control over such property; in other words, to contest the ground of its jurisdiction.").

succeeded, the defendant could then file its claim as a separate action.[65]

The adoption in 1938 of the Federal Rules of Civil Procedure "abolished the technical distinction between general and special appearances," converting the "principal method for attacking the court's jurisdiction over the person of a defendant [into] a Rule 12(b)(2) motion."[66]   In other words, as the Third Circuit so colorfully put it more than six decades ago, a defendant "is no longer required at the door of the federal courthouse to intone that ancient abracadabra of the law, *de bene esse*, in order by its magic power to enable himself to remain outside even while he steps within."[67] Since then, courts have diverged about the effect of a counterclaim or other requests for affirmative relief by a defendant who simultaneously objects to the court's personal jurisdiction.[68] While courts for some time continued to find waivers of personal jurisdiction objections based on the interposition of counterclaims, "the trend in more recent cases is to hold that no Rule 12(b) defense

---

[65]

        *InterCarbon Berm.*, 146 F.R.D. at 68–69.  "The term 'general appearance' historically applied to the defendant's submission of pleadings or motions, not limited to jurisdictional questions, regardless of whether the defendant or the defendant's attorney is physically present in court."  16 COQUILLETTE, MOORE'S FEDERAL PRACTICE § 108.53[2].

[66]

        2 COQUILLETTE, MOORE'S FEDERAL PRACTICE § 12.21[2]; *accord Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972) ("The need to file a special appearance in order to object to jurisdiction or venue has vanished.  A party can file a general appearance and object to personal jurisdiction or venue at any time before the answer is filed or in the answer.").

[67]

        *Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 874 (3d Cir.), *cert. denied*, 322 U.S. 740 (1944).

[68]

        *See M & D Info. Sys., Inc. v. Tower Grp., Inc.*, No. 05 Civ. 552, 2006 WL 752880, at *5 (S.D.N.Y. Mar. 21, 2006) ("[T]here is considerable question as to whether the jurisdictional waiver rule of *Merchants Heat* survived the enactment of the Federal Rules.").

is waived by the assertion of a counterclaim, whether permissive or compulsory."[69]

      The reasoning expressed in such cases is quite persuasive.  In the absence of a controlling ruling in our Circuit, this Court applies that "better reasoned and prevailing view."[70] The oft-cited Third Circuit opinion in *Neifeld v. Steinberg*[71] makes clear that the text, structure, and policy of Rule 12(b) compel this conclusion.  As the *Neifeld* court explained, while "nothing in the language of Rule 12(b) . . . specifically shields the defenses of lack of personal jurisdiction and improper venue from waiver when these defenses are joined with a counterclaim . . . , the Rule implicitly authorizes a defendant to join these defenses with a counterclaim without waiving these defenses" by "provid[ing] a defendant with the option of raising jurisdictional defenses by motion *or* by answer."[72]  The conclusion that a defendant, by raising a jurisdictional objection in the same pleading in which it makes a demand for affirmative relief, waives its jurisdictional objections "would in effect . . . engraft[] a judicial exception" onto the Rule by requiring jurisdictional

---

[69]

      5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1397 (3d ed. 2005); *see Procter & Gamble Cellulose Co. v. Viskoza-Loznica*, 33 F. Supp. 2d 644, 662 (W.D. Tenn. 1998) ("[T]he majority [of federal courts] now holds [that] the filing of a cross-claim or third-party claim in the same pleading in which the defendant asserts a defense of lack of personal jurisdiction does not waive the jurisdictional defense."); *see also Bayou Steel Corp.*, 809 F.2d at 1149 & n.4 (collecting cases); *M & D Info. Sys.*, 2006 WL 752880, at *6 (same); *In re Med-Atl. Petroleum Corp.*, 233 B.R. 644, 652 (Bankr. S.D.N.Y. 1999) (same).

[70]

      *Bayou Steel Corp.*, 809 F.2d at 1149 (footnote omitted).

[71]

      438 F.2d 423 (3d Cir. 1971).

[72]

      *Id.* at 428 (emphasis added).

objections in such cases to be made by motion only.[73]   As a result, the purpose behind Rule 12(b)—"to avoid the delay occasioned by successive motions and pleadings and to reverse the prior practice of asserting jurisdictional defenses by special appearance"—would be undermined.[74]   That "situation was clearly not intended to occur under the Rules."[75]

Rather, the better view is that claims for affirmative relief filed contemporaneously with objections to personal jurisdiction in a responsive pleading should "be treated as conditional, [their] assertion being hypothecated upon an adverse ruling on the defendant's jurisdictional defenses."[76]   That view seems particularly appropriate where, as here, the defendant's request for affirmative relief is a third-party complaint for what amounts to indemnity with respect to the plaintiff's claims.[77]   Pactrans included its jurisdictional objection in its answer—its first responsive

---

[73]

*Id.*; *see* 5C WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 1397 ("The conclusion that objections based on venue, personal jurisdiction, or service of process are waived when combined in the answer with a counterclaim has the effect of compelling a defendant with a counterclaim to raise these defenses by pre-answer motion or risk losing them.").

[74]

*Id.* at 429; *accord Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1330 n.1 (9th Cir. 1984) ("If we were to find a waiver when a defendant files a permissive counterclaim in the same pleading in which he asserts jurisdictional defenses, the purposes behind Rule 12(b)—to avoid the delay caused by successive motions and pleadings and to reverse the prior practice of asserting jurisdictional defenses by 'special appearances'—would be thwarted."), *cert. denied*, 471 U.S. 1066 (1985).

[75]

*Lomanco, Inc. v. Mo. Pac. R.R. Co.*, 566 F. Supp. 846, 851 (E.D. Ark. 1983).

[76]

*Neifeld*, 438 F.2d at 431 n.17; *Wafios*, 2004 WL 1627168, at *1; *Olin Corp. v. Fisons PLC*, 47 F. Supp. 2d 151, 154 (D. Mass. 1999); *accord* 5C WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 1397.

[77]

*Cf. Dr. Performance of Minn., Inc. v. Dr. Performance Mgmt., L.L.C.*, No. , 2002 WL 31628440, at *4 (D. Minn. Nov. 12, 2002) ("[T]hird-party claims for indemnification based on the same transaction or series of occurrences do not effectuate a waiver."); *Lomanco*,

pleading in this litigation—and that is what the Rule requires in order to preserve that objection in the litigation—nothing more.  The fact that Pactrans, in the same pleading, sought to state its claim for indemnity against a third party in the event it ultimately faced liability should not lead to the conclusion that its jurisdictional objection was waived.  CNCC's waiver/forfeiture argument based on Pactrans's filing of a third-party complaint therefore fails.

> ### B. *Pactrans's Suit in this Court Against N.Y. M.A.G.I.C.*

CNCC's alternative arguments related to Pactrans's alleged waiver of its personal jurisdiction objection also are unavailing.

Following the commencement of this action, Pactrans brought a separate lawsuit in this Court against its liability underwriter, New York Marine and General Insurance Co. ("N.Y. M.A.G.I.C."), in which it sought a declaratory judgment.[78]  CNCC asserts that Pactrans's "voluntar[y] commenc[ement]" of that lawsuit subsequent to the initiation of this suit waived its personal jurisdiction objection in this action.[79] But while there is some authority for the proposition that "personal jurisdiction exists where a defendant independently seeks affirmative relief in a

---

566 F. Supp. at 851 ("It is the finding of this Court that if, in the instant case, [the defendants] were held to have waived their jurisdictional objections by virtue of their filing a cross-claim for indemnity against [their co-defendant], such would amount to a requirement that these defendants make a 'special appearance' wherein they would be required to raise their objections to jurisdiction before answering on the merits.  This situation clearly was not intended to occur under the Rules.").

[78]

*See Pactrans Air & Sea Inc. v. N.Y. Marine & Gen. Ins. Co.*, No. 07 Civ. 14441, 2009 WL 3053810 (S.D.N.Y. Sept. 22, 2009) (granting summary judgment to the defendant).

[79]

DI 134, at 7.

separate action before the same court concerning the same transaction or occurrence,"[80] that authority is not persuasive in this context.

As the First Circuit explained in *Dow Chemical Co. v. Calderon*, the two cases that support the notion of such an affirmative relief rule do not support CNCC's argument here. "*Interpole* and *Embotelladora* rest primarily on the conclusion that there is nothing unfair, or violative of due process, about requiring a party that has affirmatively sought the aid of our courts with regard to a particular transaction to submit to jurisdiction in the same forum as a defendant with regard to the same transaction with the same party."[81]  Importantly, both cases "invoke[] the language pertinent to" the "minimum contacts" analysis required by constitutional due process.[82]

---

80

    *Dow Chem. Co. v. Calderon*, 422 F.3d 827, 834 (9th Cir. 2005) (emphasis removed) (discussing *Gen. Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20 (1st Cir. 1991), and *Int'l Transactions Ltd. v. Embotelladora Agral Regionmontana S.A. de C.V.*, 277 F. Supp. 2d 654 (N.D. Tex. 2002)).

    Notably, CNCC did not cite either of the two cases discussed in *Dow Chemical Co.* in its briefing to the Court.  Its assertions on this score are entirely unsupported by citations of authority.

81

    *Id.* at 835.

82

    *Id.*; *see Interpole*, 940 F.2d at 24 ("Upholding the forum court's assumption of jurisdiction over [the defendant] in Suit No. 1 seems a small price to exact for allowing [the defendant] purposefully to avail itself of the benefits of a New Hampshire forum as a plaintiff in Suit No. 2."); *Embotelladora Agral*, 277 F. Supp. 2d at 666–69 (analyzing a defendant's filing of suits in the same forum, as a plaintiff, under a "minimum contacts" analysis of personal jurisdiction); *see also Burger King*, 471 U.S. at 472 ("Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, [due process] . . . is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." (footnote and citation omitted)); *Welinsky v. Resort of the World D.N.V.*, 839 F.2d 928, 930 (2d Cir. 1988) (noting "the doctrine that minimum contacts [must] hav[e] a basis in some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state").

In other words, those cases are not essentially waiver cases at all.  They are "minimum contacts" cases speaking to a party's amenability to personal jurisdiction under the Due Process Clause.[83]

The Court will address CNCC's minimum contacts argument, including the effect of Pactrans's suit against N.Y. M.A.G.I.C., below.  For present purposes, however, it suffices to say that there is no persuasive authority for the distinct proposition put forward by CNCC—namely, that the filing of a lawsuit in the same forum in which a party is defending another suit in and of itself waives any objection to personal jurisdiction in the first suit.[84]

### C.    Delay

Moreover, this is not a case in which litigant's "substantial delay"[85] in challenging

---

[83]

But see H.A.S. Prot., Inc. v. Senju Metal Indus. Co., No. Civ. A. 03-1215, 2003 WL 23419852, at *3 (E.D. Pa. Dec. 12, 2003) (discussing Interpole in terms of waiver).

[84]

The Court acknowledges that the technical holding of Dow Chemical Co. does not squarely reject the "affirmative relief rule" the Dow court divined from Interpole and Embotelladora Agral.  That likely is so only because that court had no need to reject the rule on the facts before it.  The Dow court resolved the case on the ground that—at the very least—"defense on the merits in a suit brought by one party cannot constitute consent to suit as a defendant brought by different parties," Dow Chemical Co., 422 F.3d at 835, and the defendant in that case had not made "an independent affirmative decision to seek relief" in the forum," id. at 836; accord Fahmy v. Jay-Z, No. CV 07-5715, 2008 WL 4792383, at *4 (C.D. Cal. Oct. 29, 2008) (following Dow Chemical Co.).  Indeed, the outcome in Dow is explicitly compatible with the rule.  See id. at 834 ("We assume without deciding that this circuit would follow Interpole and Embotelladora, but conclude that the analysis in those cases does not aid" the plaintiff).  Yet the Dow court's analysis leaves little question that it viewed the rule as rooted in minimum contacts analysis rather than waiver, see id. at 835, and it explicitly stated (without deciding the case on such grounds) that it found it "doubtful that a party could demonstrate consent [i.e., waiver,] solely through an Interpole/Embotelladora–like contact," id.

[85]

In re Helicopter Crash Near Wendle Creek, B.C. on Aug. 8, 2002, 485 F. Supp. 2d 47, 51 (D. Conn. 2007).

personal jurisdiction through a motion to dismiss merits a finding of forfeiture.[86]  It is true that Pactrans did not move to dismiss the claims against it based on a lack of personal jurisdiction until its November 19, 2009 request for an order to show cause,[87] nearly three years after filing its answer.[88]  But that was because "an argument that the court lacked jurisdiction over [Pactrans] would have been directly contrary to controlling precedent in this Circuit" until the Second Circuit's decision in *Jaldhi* in June 2009.[89]  It was not until after *Jaldhi* necessitated the vacatur of the plaintiff's original attachment[90] that Pactrans for the first time gained an entirely different objection to personal jurisdiction.  Within days, it moved to dismiss for lack of personal jurisdiction based on the new argument.  As the Second Circuit has stated, "the doctrine of waiver demands

---

[86]

    CNCC did not explicitly put forward this argument in its briefing to the Court.

[87]

    DI 91.

[88]

    DI 7.

[89]

    *Hawknet*, 590 F.3d at 92; *see* DI 156 at 3 ("[A]s the prevailing law [pre-*Jaldhi*] . . . permitted jurisdiction via Rule B attachment of ETFs, Pactrans was without a legal basis to move to dismiss based on such reason alone."); *Pacnav S.A. v. Effie Bus. Corp.*, No. 06 Civ. 13512, 2010 WL 2102714, at *1 (S.D.N.Y. May 20, 2010) ("Now that the Court's assertion of quasi in rem jurisdiction over the attached funds has been found to be in error, the defendants cannot be faulted for agreeing to the Court's retaining jurisdiction at a time when the defendants had no jurisdictional defense under controlling law in this Circuit.").  Furthermore, even though, for several years after the Court attached Pactrans's property, Pactrans acquiesced in that ruling, "[c]onsent to [attachment] does not imply or effect consent to" personal jurisdiction, *India S.S. Co. v. Kobil Petroleum Ltd.*, 620 F.3d 160, 162 (2d Cir. 2010) (per curium).

[90]

    As explained above, Pactrans filed a motion to vacate the attachment on October 19, 2009, *see* DI 83, and the Court *sua sponte* ordered the plaintiff to show cause why the attachment should not be vacated one week later, *see* DI 87.

conscientiousness, not clairvoyance, from the parties."[91]  That standard was met here.


     D.     *Supplemental Rule E(8)*

     Finally, CNCC suggests in passing that Pactrans waived its jurisdictional objection because it "made a general appearance—not a restricted one pursuant to Rule E(8) as expressly provided for under the Supplemental Rules."[92]  It argues that "where a defendant has made a general appearance in an action, its waiver/consent to jurisdiction survives *Jaldhi*, although the attachment of funds does not."[93]  But the argument is incorrect.

     To be sure, Rule E(8) of the Supplemental Rules "states a very important principle."[94]  It provides that "[a]n appearance to defend against an admiralty and maritime claim with respect to which there has issued process in rem, or process of attachment and garnishment, may be expressly restricted to the defense of such claim," in which case the appearance "is not an appearance for the purposes of any other claim with respect to which such process is not available or has not been served."[95]  Yet the purpose of Supplemental Rule E(8)—to avoid the "result that, in order to defend against an admiralty and maritime claim with respect to which process has issued in rem . . . the

---

[91]

     *Hawknet*, 590 F.3d at 92.

[92]

     DI 134, at 16.

[93]

     *Id.*

[94]

     12 WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 3245.

[95]

     FED. R. CIV. P. SUPP. R. E(8).

claimant . . . must subject himself personally to the jurisdiction of the court"[96]— mirrors the policy behind the joint pleading rule described above and encompassed in Rule 12(b).  Though Pactrans did not invoke the restricted appearance provision of Rule E(8) in filing its notice of appearance on December 20, 2006,[97] Pactrans effectively preserved the rights conferred by the Supplemental Rule by filing, on the same day, an answer to the complaint asserting objections to the court's personal jurisdiction.

CNCC relies on *India Steamship Co. v. Kobil Petroleum Ltd.*[98] for the proposition that  a party's general appearance confers personal jurisdiction over that party upon the court.[99]  But *Kobil* does not speak to an appearance made in tandem with a jurisdictional objection—the situation here, which this Court has held does not forfeit such an objection.[100]  CNCC has cited no case, and

---

[96]

   FED. R. CIV. P. R. E(8) advisory committee's note (reproduced at 39 F.R.D. 69, 160–61 (1966)).

[97]

   *See* DI 5.

[98]

   620 F.3d 160 (2d Cir. 2010) (per curium).

[99]

   DI 134, at 16 (discussing *Kobil Petroleum Ltd.*, 620 F.3d at 162).

[100]

   Indeed, the language of *Kobil* is not entirely clear as to its meaning in the first instance.  The Second Circuit wrote that the defendant in that case "concede[d] that its general appearance conferred [to] the district court jurisdiction that is general and *in personam*," and that the defendant "therefore waived objection to jurisdiction over its person, asserted broadly."  *Kobil Petroleum Ltd.*, 620 F.3d at 161.  It is unclear from the text whether it was the defendant's concession, or the general appearance itself, that conferred personal jurisdiction on the court.  Even if the Circuit did intend to focus on the defendant's appearance, though, it made no mention of a contemporaneous and explicit objection to personal jurisdiction.  The presence of such an objection in this case supplies a crucial distinction with *Kobil*.  Moreover, one court in this District recently found no waiver where a litigant made general appearance to contest an attachment, did not file an answer or motion to dismiss, and filed a letter with the court acquiescing to the court's personal jurisdiction in light of pre-*Jaldhi*

the Court is aware of none, that holds that the restricted appearance provision in the Supplemental Rules vitiates a litigant's ability to plead a jurisdictional objection in an answer pursuant to Rule 12(b), even in cases subject to the Admiralty Rules.  Indeed, the Advisory Committee's Note to Rule E(8) appears to reject the type of procedural exclusivity argued for here by CNCC.[101]  The Court therefore rejects CNCC's Rule E(8) argument.

### E.    Pactrans's Withdrawal of its Motion to Reconsider

CNCC further argues that Pactrans's withdrawal, on December 7, 2009,[102] of its motion to reconsider or vacate the Court's November 16, 2009 memorandum opinion confirming CNCC's foreign arbitration award waived any post-*Jaldhi* personal jurisdiction defense that Pactrans might have had.[103]  Though not without basis, this argument is not persuasive here.

While its motion to reconsider on, *inter alia*, jurisdictional grounds remained pending in this Court, Pactrans on November 30, 2009, filed a notice of appeal to the Second Circuit of this

---

case law in this Circuit.  *See Pacnav*, 2010 WL 2102714, at *2.

[101]

See FED. R. CIV. P. SUPP. R. E(8) advisory committee's note (reproduced at 39 F.R.D. at 161) ("Where admiralty and maritime claims within the meaning of Rule 9(h) are concerned, however, it seems important to include a specific provision to avoid an unfortunate and unintended effect of unification.  No inferences whatever as to the effect of such an appearance in an ordinary civil action should be drawn from the specific provision here and the absence of such a provision in the general Rules.").

[102]

DI 104.

[103]

See DI 134, at 10; *id.*, at 11 ("Pactrans used its one and only 12(b)(2) personal jurisdiction motion. . . .  Either intentionally or inadvertently, Pactrans waived personal jurisdiction the moment it withdrew its jurisdictional motion that had been pending before this Court.").

Court's November 16 memorandum opinion.[104]

   Generally, "the docketing of a notice of appeal 'ousts the district court of jurisdiction except insofar as it is reserved to it explicitly by statute or rule.'"[105]  In other words, "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."[106]  But in practice that rule is neither so categorical nor unqualified.  In *United States v. Rodgers*,[107] the Second Circuit made clear that "[t]he divestiture of jurisdiction rule is . . . not a per se rule" but "a judicially crafted rule rooted in the interest of judicial economy, designed to avoid confusion or waste of time resulting from having the same issues before two courts at the same time."[108]  Insofar as the rule's "application is guided by concerns of efficiency and is not automatic,"[109] for example, it "does not apply where an appeal is frivolous[,] [n]or does it apply to untimely or otherwise defective appeals."[110]

   The November 30 notice of appeal filed by Pactrans might indeed have been

---

[104]

  DI 101.

[105]

  *Toliver v. County of Sullivan*, 957 F.2d 47, 49 (2d Cir. 1992) (quoting *Ryan v. U.S. Line Co.*, 303 F.2d 430, 434 (2d Cir. 1962)).

[106]

  *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

[107]

  101 F.3d 247 (2d Cir.1996), *cert. denied*, 520 U.S. 1188 (1997).

[108]

  *Id.* at 251 (internal quotation marks omitted).

[109]

  *Id.*

[110]

  *In re Chevron Corp.*, 749 F. Supp. 2d 170, 179 (S.D.N.Y. 2010).

frivolous, as the case against third-party defendant Devon remained unresolved, thus rendering the confirmation order interlocutory, and no Rule 54(b) certification was sought or acquired.[111] Additionally, the Federal Rules of Appellate Procedure likely rendered the notice of appeal ineffective *ab initio*, as a notice of appeal filed while a Rule 59 motion for reconsideration is pending in the district court "becomes effective" only "when the order disposing of the . . . remaining motion is entered."[112]  The Court therefore concludes that the notice of appeal probably did not divest it of jurisdiction over the matter during the period in question.  As a result, there is a material question whether Pactrans waived its jurisdictional objection by withdrawing its motion for reconsideration.  Despite Pactrans's assertion that the withdrawal came "at the behest of the Second Circuit,"[113] in fact the Circuit's applications judge had simply expressed uncertainty about "what [wa]s pending before" each court and explained Pactrans's two options—continue with its appeal in the Circuit or withdraw its appeal and await this Court's resolution of Pactrans's motion for reconsideration.[114]  Pactrans made its choice, and that choice carried with it certain consequences, one of which may have been the waiver of its jurisdictional argument to this Court.

But the Court is mindful that waiver—"the intentional relinquishment or

---

[111]

> See FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties . . . .").

[112]

> FED. R. APP. PROC. 4(a)(4)(B)(i).

[113]

> DI 104, at 4.

[114]

> DI 159 Exh. D, at 11:18–21.

abandonment of a known right"[115]—"requires a finding that such waiver is knowing and intelligent."[116]  In the circumstances of this case, the Court concludes that Pactrans's withdrawal of its motion for reconsideration was not a "knowing and intelligent" abandonment of its personal jurisdiction objection.  In electing to pursue its appeal despite the probable lack of appellate jurisdiction, Pactrans may not have acted entirely wisely, but it almost certainly did believe that its jurisdictional argument remained in play.  After all, making that very argument was Pactrans's purpose in pursuing the appeal in the first place.  The Court therefore rejects CNCC's waiver argument based on Pactrans's withdrawal of its motion for reconsideration before this Court.

## II.    New York Registration of Pac Logistics Service Co.

CNCC next argues that (1) Pactrans is an *alter ego* of Pac Logistics Service Co. Ltd. ("PLSC"), (2) PLSC, as of August 15, 2007, was registered to do business in the State of New York, and (3) Pactrans therefore is subject to the Court's personal jurisdiction.[117]  PLSC responds that it registered in New York after this action was commenced and that the registration would be immaterial even if PLSC were an *alter ego* of Pactrans.[118]  Moreover, Pactrans denies the *alter ego*

---

[115]    *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted).

[116]    *Gilchrist v. O'Keefe*, 260 F.3d 87, 95 (2d Cir. 2001), *cert. denied*, 535 U.S. 1064 (2002).

[117]    DI 134, at 17; *id.*, at 24 (arguing that there is "no meaningful distinction between" Pactrans and PLSC).

[118]    DI 153, at 3.

allegation in addition to advancing other arguments that need not be considered.[119]

As an initial matter, where "personal jurisdiction exists over [a defendant], jurisdiction over his alter ego is proper as well."[120]  And "[i]t is well-settled under New York law that registration under [New York Business Corporation Law Section] 1304 subjects foreign companies to personal jurisdiction in New York."[121]  CNCC therefore is correct in asserting that Pactrans would be subject to personal jurisdiction in this action if PLSC were its *alter ego* and had registered in New York.  The problem, however, is that "personal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed."[122]  As PLSC first registered in New York after this action was commenced,[123] Pactrans would not be subject to

---

[119]

DI 156, at 8–13.

[120]

*SEC v. Montle*, 65 F. App'x 749, 753 (2d Cir. 2003) (summary order); *see Glory Wealth Shipping Pte Ltd. v. Indus. Carriers, Inc.*, 590 F. Supp. 2d 562, 564 (S.D.N.Y. 2008) ("Where one defendant is subject to personal jurisdiction and service of process, its alter egos are subject to personal jurisdiction and may be served by serving it." (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 142–43 (2d Cir. 1991)).

[121]

*STX Panocean (UK) Co. v. Glory Wealth Shipping Pte Ltd.*, 560 F.3d 127, 131 (2d Cir. 2009) ("Only one Southern District of New York case, *Erne Shipping Inc. v. HBC Hamburg Bulk Carriers, GmbH & Co. KG*, 409 F. Supp. 2d 427 (S.D.N.Y. 2006), *rev'd in part by Aqua Stoli* [*Shipping Ltd. v. Gardner Smith Pty Ltd.*], 460 F.3d [434,] 446 [(2d Cir. 2006), *overruled on other grounds by Jaldhi*, 585 F.3d 58,] has found a foreign corporation's mere filing for authorization to do business in New York to be insufficient under Rule B . . . ." (citing, *inter alia*, *Robfogel Mill-Andrews Corp. v. Cupples Co., Mfrs.*, 323 N.Y.S.2d 381, 382–83 (1971))).  *But see Beja v. Jahangiri*, 453 F.2d 959, 962 (2d Cir. 1972) (stating that "the mere authorization to do business, even though granted at a corporation's request, may not be conclusive on the issue of jurisdiction under" N.Y. CPLR Section 301).

[122]

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.3d 44, 52 (2d Cir. 1991).

[123]

Both parties represent that "Pac Logistics registered to do business [in New York] on August 15, 2007." DI 134, at 17; *accord* DI 153, at 2 ("[I]t is undisputed that PLSC did not

personal jurisdiction based on PLSC's registration to do business in New York State even if they were *alter egos*.

That settles the issue.  As an aside, however, the Court notes that CNCC's argument in this respect has more than a tinge of irony.  If PLSC, as CNCC argues now, had been Pactrans's *alter ego* and PLSC's registration in New York thereby rendered Pactrans subject to personal jurisdiction here, Pactrans would have been "present" in this District at the time CNCC filed its attachment motion.  That would have required the vacatur (or denial) of the original attachment under Rule B.  One court in this District pointedly discussed the "heads you win, tails I lose" conundrum that *alter ego* arguments play in the maritime attachment context:

> "Because alter egos of a defendant present in the district are present in the district, [a plaintiff] can satisfy its burden [for attachment under Rule B] only if it concedes that its alter ego allegation is baseless.  [The plaintiff] could make this concession in the alternative, but either way it loses.  If [the alleged alter ego] is an alter ego, it is found in this district; if [it] is not an alter ego, there is no valid prima facie maritime claim to support an attachment."[124]

Indeed.  And, notably, courts in this District have followed this line of argument to its logical conclusion.[125]

---

[124]

apply for a license to do business in New York until 2007.");

*Glory Wealth Shipping*, 590 F. Supp. 2d at 564.

[125]

*See, e.g.*, *Nanyuan Shipping Co. v. Marimed Agencies UK*, 595 F. Supp. 2d 314, 318 (S.D.N.Y. 2009) ("By all accounts, Marimed is not a signatory to the Charter Party, and Nanyuan does not assert any other allegations giving rise to a valid prima facie maritime claim against Marimed in its own right.  Therefore, absent a theory of alter ego status, the Attachment against Marimed must be vacated.  In the alternative, if Marimed was Liana Ltd.'s alter ego at the time the Complaint was filed, the Attachment must be vacated if Liana Ltd. (1) could be found in this District at that time for jurisdictional purposes; and (2) could be found in this District at that time for service of process."); *In re Arbitration Between Stolt-Nielsen Transp. Grp. B.V.*, No. 06 Civ. 703, 2008 WL 650391, at *2 (S.D.N.Y. Mar. 7, 2008) ("Petitioner did not originally seek an attachment pursuant to this rule because when the complaint was filed, Edible maintained on office in Manhattan.  Due

III.      *Pactrans's Actions in New York State*

CNCC argues also that Pactrans is subject to personal jurisdiction by virtue of its own actions in New York.[126]  Pactrans replies that "after it became apparent that Plaintiff's attachment would no longer be permitted after [*Jaldhi*], Plaintiff has apparently amended the factual allegations of its claim."[127]  Pactrans claims that CNCC has done so without moving for leave to amend its complaint but, in any case, "has failed to demonstrate that Pactrans had sufficient contacts with the District prior to the commencement of the action" to subject it to personal jurisdiction.[128]

"The amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with federal law entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee."[129]  A district court therefore must conduct a two-part inquiry to resolve questions of personal jurisdiction.  "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second,

---

to this presence, petitioner believed it was precluded from seeking a Rule B attachment against the respondents because of their alter ego relationship.  Apparently, Edible has now closed its Manhattan office and petitioner now views Rule B as available." (citations omitted)).

[126]

*See* DI 134, at 24–31.

[127]

DI 156, at 14.

[128]

*Id.*

[129]

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration and internal quotation marks omitted); *accord Arrowsmith v. United Press Int'l*, 320 F.2d 219, 222–23 (2d Cir. 1963) (en banc).

it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process."[130]

CNCC does not rely on New York's long-arm statute, N.Y. CPLR Section 302, as a basis for personal jurisdiction.  Rather, it relies exclusively on the state's general jurisdiction statute, CPLR Section 301.[131]  In *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,[132] the Second Circuit explained—as to Section 302—"[t]he New York long-arm statute does not extend in all respects to the constitutional limits established by *International Shoe Co. v. Washington*,[133] and its progeny."[134]  The same is true of Section 301.[135]

> "Where, as here, the plaintiff[] premise[s] [its] theory of personal jurisdiction upon the New York . . . statute, [the Court first consider[s] whether the requirements of the statute have been satisfied before proceeding to address whether the exercise of jurisdiction would comport with the Due Process Clause.  This reflects our respect for the doctrine of constitutional avoidance.  We therefore address the statutory bases of personal jurisdiction prior to considering the constitutional limitations."[136]

> Proceeding in this manner, N.Y. CPLR Section 301 provides that "[a] court may

---

130

    *Metro. Life Ins. Co.*, 84 F.3d at 567; *accord Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990).

131

    *See* DI 134, at 24–25.

132

    673 F.3d 50 (2d Cir. 2012).

133

    326 U.S. 310 (1945).

134

    *Licci*, 673 F.3d at 60–61 (citation omitted).

135

    *See Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 764 n. 6 (2d Cir. 1983) ("As interpreted by the New York state courts, [N.Y. CPLR Sections] 301 and 302 do not extend personal jurisdiction to the limits of due process.").

136

    *Licci*, 673 F.3d at 61 (citations and footnote omitted); *see Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010).

exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."[137]  As the Second Circuit has explained,

> "[i]n the case of a foreign corporation, section 301 keeps alive the case law existing prior to its enactment, which provided that a corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'"[138]

"In order to establish that this standard is met, a plaintiff must show that a defendant engaged in 'continuous, permanent, and substantial activity in New York.'"[139]

"New York courts have focused on several factors to support a finding that a defendant was 'doing business,' including the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York.[140]  Solicitation alone ordinarily will not suffice.  But where such solicitation is combined with evidence that the defendant "engages in other activities of substance in the state, then personal jurisdiction may properly be found to exist."[141]

CNCC contends that "the evidence and information obtained with regard to Pactrans'[s] business activities in and relating to New York show quite plainly that Pactrans

---

[137]

N.Y. CPLR § 301.

[138]

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985) (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267 (1917)).

[139]

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)).

[140]

*Schultz v. Safra Nat'l Bank of N.Y.*, 377 F. App'x 101, 102–03 (2d Cir. 2010) (quoting *Landoil*, 918 F.2d at 1043) (internal quotation marks omitted).

[141]

*Landoil*, 918 F.2d at 1043–44.

regularly ships, receives[,] and handles good in New York directly and/or through a variety of agents."[142]  It first points to "150 shipments made since late 2007" involving Pactrans that either originated or arrived in New York.[143]  Then, over several pages in its opening and reply briefs to this Court, CNCC lists various supposed contacts between Pactrans and New York, catalogued in part here: a "list of shipments" as "proof that Pactrans regularly ships goods to New York, in New York, and from New York;"[144] "written service contract[s]" dated July 1, 2007, pursuant to which "Pactrans engaged in the commercial shipment of cargo to and from New York from 2007 to 2009;"[145] allegations that Pactrans "has operations in all major US ports including New York and has picked up and delivered cargo in the state of New York as part of its shipping business;"[146] assertions that "Pactrans engages in business with New York companies" and "has a network of agents in New York, including trucking agents, air handling agents, and U.S. Customs[] agents that transport, store, and/or re-ship Pactrans'[s] cargo in New York at Pactrans'[s] direction;"[147] evidence that Pactrans "has a New York client base" and "a history of importing goods from China into New York and coordinating the distribution of those goods to 16 Lord and Taylor stores throughout New

---

[142]

     DI 134, at 25 (emphasis removed).

[143]

     *Id.*

[144]

     *Id.*, at 26.

[145]

     *Id.*

[146]

     *Id.*, at 27.

[147]

     *Id.*

York;"[148] allegations that "Pactrans has participated in, and still participates in, trade shows in New York;"[149] a Pactrans officer's deposition testimony stating that "Pactrans may have merchandise in New York from time to time;"[150] allegations that "Pactrans enters into 90–130 contracts a year to ship goods from abroad to New York;"[151] evidence that Pactrans made payments to New York companies in May 2010;[152] evidence that Pactrans conducted $80,000 of business in New York in November 2010;[153] allegations that Pactrans has customers in New York;[154] evidence that "Pactrans regularly and systematically imports goods from abroad to New York . . . for Urban Attitudes, LLC, a New York corporation near the Southern District of New York courthouse;"[155] and "Pactrans['s] open[] admi[ssion] that it performs air freight business in New York."[156]

Even taking all of these allegations as true, even taking CNCC to have requested (and been granted) leave to amend its complaint—which, it bears noting, alleges that Pactrans "cannot

---

[148]  *Id.*, at 28.

[149]  *Id.*

[150]  *Id.*, at 29.

[151]  DI 159, at 6.

[152]  *Id.*, at 6–7.

[153]  *Id.*, at 7.

[154]  *Id.*, at 10–13.

[155]  *Id.*, at 16.

[156]  *Id.*, at 20.

be found within this District"[157]—to include such facts, and even assuming that such actions would satisfy the requirements of CPLR Section 301, CNCC would fail to establish jurisdiction for one crucial reason.  As stated above, "[i]n assessing whether a defendants' contacts with New York are sufficient to establish general jurisdiction, the relevant question is whether the defendant was present in New York at the time the complaint was filed."[158]  As Pactrans argues, "[w]hile Plaintiff provides evidence that Pactrans had contacts with firms and businesses in New York since 2007, such evidence is irrelevant in this instant matter, which was commenced [on] November 9, 2006."[159]

CNCC makes only very limited attempts, even in reply, to argue that the evidence upon which it relies satisfies the timing requirement.  In fact, this Court's review reveals only three pieces of "evidence" marshaled by CNCC that arguably go to Pactrans's "doing business" in New York at or before the filing of the complaint in this action in November 2006.[160]  First, CNCC makes a lone statement asserting that "Pactrans appears to have conducted . . . business on a consistent

---

[157]

DI 1, ¶ 13.

[158]

*Duravest, Inc. v. Viscardi, A.G.*, 581 F. Supp. 2d 628, 638 (S.D.N.Y. 2008); *accord Metro. Life Ins. Co.*, 84 F.3d at 569–70 ("The minimum contacts inquiry is fact-intensive, and the appropriate period for evaluating a defendant's contacts will vary in individual cases.  In general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances-up to and including the date the suit was filed-to assess whether they satisfy the 'continuous and systematic' standard."), 570 n.9 ("[A] court must consider the defendant's contacts with the forum state at the time the lawsuit was filed." (citing *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991))); *Darby v. Compagnie Nat'l Air Fr.*, 735 F.Supp. 555, 560 (S.D.N.Y. 1990) (remarking that to satisfy N.Y. CPLR Section 301, a "plaintiff must allege [that the] defendant [is] doing business as of commencement of action").

[159]

DI 156, at 14.

[160]

The Court notes that Pactrans's suit against N.Y. M.A.G.I.C., while not relied upon in the "contacts with New York" argument in CNCC's brief, should also be considered a "contact" for personal jurisdiction purposes.

basis prior to the filing of this action," citing to a document "which appears to [be] an ocean bill of lading dated February 2, 2006, wherein Pactrans was named as the consignee and notify party of the cargo being delivered in New York."[161]   Second, CNCC represents—without supporting documentation—that "Pactrans obtained an insurance policy with a New York insurer in 2006 in relation to its shipping business and others, which provided that all disputes were to be resolved under New York law."[162]   And third, CNCC states that "Pactrans'[s] principals have traveled to New York to solicit business, to meet with customers, and to participate in trade associations," and that, specifically, one principal "flew to New York to attend . . . the Association of Ship Brokers and Agents (USA) Inc. . . . in New York" in June 2006.[163]

Whatever the significance of those alleged contacts,[164] they do not rise to the level required by N.Y. CPLR Section 301.[165]   They are not the type of "quality"[166] contacts sufficient

---

[161]

DI 134, at 25 (emphasis removed).

[162]

*Id.*, at 29.  Presumably, the insurance policy is with N.Y. M.A.G.I.C.

[163]

DI 159, at 8.

One further CNCC discussion of evidence merits mention here.  In its reply, CNCC represents that its discovery yielded evidence of "164 Pactrans shipments to New York" in 2006.  DI 159, at 14.  Yet after the Court's inspection of the referenced documents—which are bill of lading information printed from a public Chinese Web site, verified only through an "index" filed as part of an attorney declaration, *see* DI 160, at 3—not a single document demonstrates a shipment directed to anywhere but Newark, New Jersey.  (The best that might be said is that the shipments indicated on the documents contained goods with "marks & numbers" located in New York.)  CNCC's attempts to blur the distinction between the two states by referring to the "Port of New York/Newark," DI 159, at 14, will not fly in this Court.

[164]

And the suit against N.Y. M.A.G.I.C.

[165]

*See* DI 156, at 16 ("Even accepting that Plaintiff's unsupported allegations of two business activities occurring in February 2006 as true, such miniscule contacts can hardly be

37

individually to establish personal jurisdiction.  Nor are they indicative of  a "fair measure of

permanence and continuity"[167] in Pactrans's contacts with New York prior to the filing of the

complaint.  Indeed, it is useful to remember that, as of the filing of CNCC's complaint, CNCC

asserted the very contrary argument that Pactrans was not "found" within this District in order to

attach EFTs destined for Pactrans.[168]

        For all of these reasons, the Court rejects CNCC's personal jurisdiction argument

---

considered continuous and systematic contacts constituting doing business in New York, so as to subject Pactrans to general personal jurisdiction in this District.").

CNCC argues that it must only make a "*prima facie* showing of jurisdiction to sustain a judgment which has already been entered." DI 159, at 7 (internal quotation marks omitted). But even the case it cites for that proposition acknowledges that such is true only where the Court has not "conduct[ed] a full-blown evidentiary hearing on a motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).  The "*prima facie* showing" standard applies only "prior to discovery." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998).  Here, of course, extensive discovery took place after remand from the Second Circuit.  And even if CNCC were only required to make a *prima facie* showing of jurisdiction here, the Court is quite certain that it has not done even that.  Thus, CNCC's argument for a lower standard here borders on the frivolous, and the Court roundly rejects it.

[166]

*Licci*, 673 F.3d at 62.

[167]

*Darby*, 735 F.Supp. at 560.

[168]

*See* DI 156, at 13 ("Plaintiff commenced the instant action by requesting a Rule B attachment of Pactrans'[s] EFTs because it asserted that Pactrans could not be found in the District following a diligent search.  With the benefit of such contention, Plaintiff was able to obtain jurisdiction over Pactrans, when it otherwise would not have been able to in this District, and was able to attach and restrain significant funds of Pactrans for many years.  Despite there being a prior case filed in the Northern District of Florida, Plaintiff avoided appearing in such competent district, which actually had a connection to the facts of the case as it where the shipment [in issue underlying the instant dispute] was delivered, and sought relief in New York, purely for the benefit of attachment.").

under N.Y. CPLR Section 301(a).[169]


## IV.   *Pactrans's Attachable Property In New York State*

Pulling yet another arrow from its quiver, CNCC contends that, "[u]pon information and belief, Pactrans had, and continues to have, property other than EFTs subject to attachment in the Southern District of New York including, but not limited to, claims and/or other amounts owed from third-party defendant Devon to Pactrans, among them amounts owed to Pactrans under a judgment rendered against Devon in the Northern District of Florida."[170]  CNCC therefore appears to argue that it may attach other property belonging to Pactrans  pursuant to Rule B.  It contends that it thereby could establish personal jurisdiction sufficient to support the Court's confirmation of the foreign arbitral award.

---

[169]

As the Court has found CNCC's personal jurisdiction argument lacking under state law, the Court will not undertake an analysis as to Pactrans's contacts with New York State through the lens of constitutional Due Process.  *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).

Though CNCC does not argue it forms the basis of the Court's jurisdiction here, CPLR Section 302(a) provides, in pertinent part, that a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," so long as the plaintiff's "cause of action aris[es] from" that "transact[ion]."  N.Y. CPLR § 302(a).  "So, in determining whether personal jurisdiction may be exercised under Section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction."  *Licci*, 673 F.3d at 60 (alteration in original) (internal quotation marks omitted).

Here, there can be no question that the cause of action in this matter did not "arise from" a "transaction" in New York—the transaction at the heart of the plaintiff's cause of action is damage to cargo loaded onto a vessel in China and unloaded in Florida.  Therefore, no alternative basis for personal jurisdiction under Section 302—even ignoring any issues of waiver of that argument—exists here.

[170]

DI 134, at 31.

Again, CNCC's arguments are easily dispatched, as they are "without any merit or legal basis."[171]   CNCC identifies just two sources of "property" belonging (again, "[u]pon information and belief") to Pactrans that, it claims, would be subject to attachment under Rule B and thereby subject Pactrans to personal jurisdiction here: (1) a judgment against Devon in the Northern District of Florida; and (2) "a contractual obligation" by PLSC, under a lease agreement, "to pay monies . . . to Pactrans."[172]

CNCC's attachable property argument is not constricted by the personal jurisdiction requirement that the Court's inquiry focus only on facts existing at the time the complaint was filed. In other words, if Pactrans currently has attachable property in New York, the Court—for the sake of argument, ignoring procedural failures such as the absence of a renewed Rule B application, or a motion for leave to amend the operative complaint here—could authorize the attachment of such property and, if property were attached, the attachment would subject Pactrans to the Court's personal jurisdiction.   That arguably would suffice to support the entry of a confirmation of the foreign arbitration award, just as the Court earlier concluded—before *Jaldhi*—that Pactrans's EFTs had done.

But CNCC has not demonstrated that either of Pactrans's allegedly identified attachable property is located within New York, which would be a prerequisite to attachment.   "Rule B permits attachment only when 'defendant is not found within the district,' FED. R. CIV. P. SUPP. R. B(1)(a), thus allowing the assertion of personal jurisdiction by a district court only in the narrow class of cases *where the defendant has property within the district*, but not a sufficient presence

---

[171]   DI 156, at 16.

[172]   DI 134, at 31.

within the district so that it is 'found within the district.'"[173]

The law of New York also is clear.  "In *Hotel 71 Mezz Lender LLC v. Falor*,[174] the New York Court of Appeals made quite lucid the distinction between the use of attachment itself in order to establish personal jurisdiction—so-called *quasi in rem* jurisdiction—and the use of attachment where there exists an independent basis for personal jurisdiction."[175]  The Court of Appeals explained that "when attachment is used to serve as a jurisdictional predicate"—the very purpose of Rule B attachments—"a New York court cannot attach property not within its jurisdiction."[176]

"[T]he situs of" the alleged property here, under the law of New York, "is 'the location of the party of whom performance is required by the terms of the contract.'"[177]  As to the Florida judgment, CNCC has alleged nothing regarding the location of Devon—whose "performance" as judgment debtor would be at issue here—let alone sufficiently demonstrated that Devon is located in New York.  The Illinois lease complicates matters a bit.  If PSLC does have a

---

[173]

*Hawknet*, 590 F.3d at 92 (emphasis added).

[174]

14 N.Y.3d 303 (2010).

[175]

*Mishcon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*, No. 11 Civ. 4971, 2011 WL 6957595, at *5 (S.D.N.Y. Dec. 28, 2011) (citation omitted).

[176]

*Hotel 71*, 14 N.Y.3d at 311 (internal quotation marks omitted); see *Allied Mar., Inc. v. Descatrade SA*, 620 F.3d 70, 74 (2d Cir. 2010) ("In cases where the District Court has no basis for personal jurisdiction over a party, jurisdiction can be established 'based on the court's power over property within its territory.'  In such cases, the District Court must have jurisdiction over the defendant's property in order to be able to affect the defendant's interests." (quoting *Shaffer v. Heitner*, 433 U.S. 186, 199 (1977)).

[177]

*EM Ltd. v. Republic of Arg.*, 389 F. App'x 38, 44 (2d Cir. 2010) (summary order) (quoting *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 675 (1976)); *accord Consub Del. L.L.C. v. Schahin Eugenharia Limitada*, 676 F. Supp. 2d 162, 167 (S.D.N.Y. 2009).

contractual obligation to pay rent to Pactrans, and if PSLC ("the party of whom performance is required") were located in New York, CNCC would have a colorable argument that the lease is attachable within this district. But the argument—an argument that CNCC nowhere spells out with any clarity whatsoever—faces various hurdles.

First, CNCC points to an "Exhibit 12" that is the "alleged lease agreement between [PLSC] and Pactrans."[178] But the Court's search of the declarations in the record pertinent to this motion has revealed no such lease marked as "Exhibit 12."

Beyond the issue of whether the lease itself is properly before the Court, CNCC's only argument regarding PLSC's presence in New York—despite its catalogue of evidence dating after 2007 that Pactrans itself has ongoing contacts with New York—is that it is registered to do business here.[179] Yet PLSC informed the Court on September 7, 2011, that "its authority to do business in the State of New York . . . was deemed to have been surrendered" by New York State as of August 26, 2011.[180] Questions certainly abound regarding the effect of that surrender—for example, if such surrender was intentional on the part of PLSC in order to avoid the very kind of attachment under discussion here, the Court conceivably might effectively ignore it, or entertain argument as to PLSC's contacts with New York beyond mere registration. But far more questions surround the most important issue for this line of inquiry: whether PLSC is located in New York for the purposes of the proposed attachment of the payments under the lease.

Unfortunately, CNCC devotes less than half a page (in its more-than sixty pages of

---

[178]

DI 134, at 31 (emphasis removed).

[179]

*See id.*, at 17.

[180]

Letter from James M. Maloney, Counsel for PLSC, to Court, at 1 (Sept. 7, 2011).

briefing to the Court) to making its argument as to a hypothetical new attachment. It has not amended its complaint to seek to attach new property. It has not—beyond one irrelevant case citation[181] and one bare assertion[182]—provided the Court with any justification for a new attachment. And other than relying on PLSC's (now apparently surrendered) registration to do business in New York, it has not demonstrated that PLSC itself is subject to the Court's personal jurisdiction, which is an essential element of the foregoing argument. In these circumstances, the Court will not litigate the issue on CNCC's behalf. CNCC had months to conduct appropriate jurisdictional discovery and to put forward a coherent position. It has not done so.

V.      *Attorneys' Fees and Costs; Discovery Sanctions*

Two final matters may be disposed of briefly.

First, CNCC argues that Pactrans has "failed to proffer a good reason not to pay [the] arbitration award" and that "attorneys' fees and costs should be awarded to CNCC" because it has felt it appropriate to "resort to enforcement procedures."[183]

---

181

CNCC quotes a passage from *Engineering Equipment Co. v. S.S. Selene*, 446 F. Supp. 706 (S.D.N.Y. 1978), apparently to support the argument that the lease is "within the Court's reach." DI 134, at 31. But the outcome in that case—that certain debts are attachable within the meaning of Rule B—rested in part on the court's conclusion that the "defendants (the garnishees) are subject to [the court's] in personam jurisdiction." *S.S. Selene*, 446 F. Supp. 2d at 708–09. Yet, as discussed above and in *Hotel 71*, that is an entirely distinct situation from the Rule B attachment context, whereby personal jurisdiction is sought *as a result of* an attachment. With that in mind, the case citation does little to support CNCC here.

182

CNCC states, without analysis or legal citation, that the lease "**is an attachable obligation**." DI 134, at 31 (emphasis in original).

183

DI 134, at 32.

To be sure, "[a] court may, pursuant to its inherent equitable powers, assess attorneys' fees and costs when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"[184]  And "[i]n actions for the confirmation and enforcement of arbitral awards, a court may award attorneys' fees if the party challenging the award has 'refuse[d] to abide by an arbitrator's decision without justification.'"[185]

This, obviously, is not such a case.  As the outcome of the Court's analysis demonstrates, Pactrans's litigating position is hardly meritless or without justification.  In fact, it has prevailed.[186]  And the Court's fee-shifting authority pertains only to a "successful litigant['s]" demonstration by "clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes."[187]  CNCC's bid for fees and costs therefore fails.

---

[184]

First Nat'l Supermarkets, Inc. v. Retail, Wholesale & Chain Store Food Emps. Union Local 338, 118 F.3d 892, 898 (2d Cir. 1997) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45–46 (1991)).

[185]

Id. (quoting Int'l Chem. Workers Union (AFL–CIO), Local 227 v. BASF Wyandotte Corp., 774 F.2d 43, 47 (2d Cir. 1985)).

[186]

Cf. Int'l Chem. Workers Union, 774 F.2d at 47 (concluding that "[i]n light of" the defendant's "success on appeal, it is clear that the district court did not abuse its discretion in denying the motion for attorney[s'] fees").

Furthermore, the matter presently before the Court is not here at CNCC's reluctant election. Rather, CNCC lost an appeal in the Second Circuit, which then essentially ordered the instant briefing and inquiry to commence here.

[187]

Dow Chem. Pac. Ltd. v. Rascator Mar. S.A., 782 F.2d 329, 344 (2d Cir. 1986) (alteration and internal quotation marks omitted).

Second, for the first time in its reply brief,[188] CNCC argues that even if the Court rejects all of its personal jurisdiction arguments as a matter of substance, the Court nevertheless should hold that Pactrans is subject to the Court's jurisdiction because Pactrans violated its obligations under various discovery orders of this Court and of Magistrate Judge Ellis.[189] This Court declines to entertain an argument first raised in a reply brief.[190]

## Conclusion

For the foregoing reasons, the Court concludes that it lacks personal jurisdiction over the defendant.


SO ORDERED.

Dated:      July 31, 2012

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[188]    On August 4, 2011, CNCC wrote a letter to the Court requesting that its reply brief be permitted to exceed ten pages. *See* DI 161. Judge Swain, acting as Part I judge, granted the request on August 9, 2011, endorsing the letter but requiring that the brief "not . . . exceed 15 pages." *Id.* The same day, CNCC filed its reply, which totaled twenty-eight pages. *See* DI 159. Whether CNCC filed its brief before or after it was aware of Judge Swain's endorsement, its brief came in at nearly either twice or three times the permitted length. With the reply brief, CNCC also filed 79 exhibits. *See* DI 160.

Pactrans objected to this action by letter dated August 9, 2011. *See* Letter from Bill X. Zou, Counsel for Pactrans, to Court (Aug. 9, 2011).

[189]    *See* DI 159, at 5, 22–27.

[190]    *See Rosario v. N.Y.C. Dep't of Homeless Servs.*, No. 06 Civ. 7197, 2008 WL 449675, at *8 (S.D.N.Y. Feb. 19, 2008) ("This argument may have merit, but because it was not raised until the reply brief it will not be addressed.").